UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARREN DEON JOHNSON,

                 Petitioner,                      Case No. 1:13-cv-338

v.                                      Honorable Paul L. Maloney

CINDI S. CURTIN,

                 Respondent.
_____/

## OPINION

       This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On December 11, 2009, following a jury trial in the Kent County Circuit Court, Petitioner Darren Deon Johnson was convicted of one count of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(c), and one count of first-degree home invasion, MICH. COMP. LAWS § 750.110a(2). On January 21, 2010, Petitioner was sentenced to consecutive terms of imprisonment of: (1) 20 to 60 years on the first-degree criminal sexual conduct conviction; and (2) 10 to 30 years on the first-degree home invasion conviction. The trial court also ordered that Petitioner's state sentences be served consecutively to a federal term of imprisonment that had been imposed following the revocation of his federal supervised release. *See United States v. Johnson*, 1:04-cr-219 (W.D. Mich.) (J., ECF No. 68).[1] Petitioner began serving his state sentences on September 23, 2011.

_____

[1] Petitioner's supervised release was revoked because of the criminal sexual conduct he challenges in this petition. *Johnson*, 1:04-cr-219 (W.D. Mich.) (Mar. 5, 2009 Tr., ECF No. 70, PageID.275) ("I find by a preponderance of the evidence, and if the standard were beyond a reasonable doubt, I would find beyond a reasonable doubt that the defendant, Darren Johnson, did commit the offense of – it would be rape in my judgment, certainly sexual assault; and if not sexual assault, assault, and I base that on my opportunity to observe the witnesses. The testimony of Ms. Fleming in and of itself would be sufficient to convict the defendant beyond a reasonable doubt . . . .").

In his pro se amended petition Petitioner raises six issues:

I.      I was denied a fair and impartial trial when the trial court didn't allow my alibi witness to appear in civilian clothing.

II.     I was denied my right to effective assistance of counsel because my trial attorney was unprepared for trial, missed discovery deadlines, and misstated facts.

III.    I was denied a fair and impartial trial when the complaining witness perjured herself about the persons authorized on the lease for the apartment at 1039 Bridge.

IV.     I was denied a fair and impartial trial because of prosecutorial [mis]conduct when the prosecutor knew the complaining witness was perjuring herself.

V.      I was denied a fair and impartial trial when my trial counsel failed to introduce mitigating evidence.

VI.     I was denied a fair and impartial trial when my trial attorney failed to properly cross-examine witnesses for the prosecution.

( Am. Pet., ECF No. 25, Page ID.345-353.)  Petitioner raised all six of these issues in the briefs he filed in the Michigan Court of Appeals.  (ECF No. 36, Def.-Appellant's Br., p. i; Def.-Appellant's Standard 4 Br., p. 4 .)  In an unpublished opinion issued June 28, 2011, the court of appeals affirmed the convictions.  Petitioner sought leave to appeal to the Michigan Supreme Court, raising the issues he had raised in the court of appeals except for two distinct claims.  (Def.-Appellant Appeal Br., ECF No. 37, p. 2.)  In his application for leave to appeal, Petitioner did not raise the claim that his counsel was ineffective because he misstated facts (part of issue II) or his claim that he was denied a fair and impartial trial when his trial attorney failed to properly cross-examine witnesses for the prosecution (issue VI).[2]   The supreme court denied leave to appeal on December 28, 2011.

---

[2]Petitioner also raised several claims in the Michigan Supreme Court for the first time, issues challenging the Michigan Court of Appeals' decisions permitting the prosecution to file a late reply brief and denying Petitioner the opportunity to file a sur-reply brief, as well as issues challenging the effective assistance of his trial counsel because: (1)

Petitioner timely filed his initial petition on March 22, 2013.  He filed his amended petition on November 20, 2013.  On October 29, 2013, Respondent filed an answer to the petition, (ECF No. 22), which addressed all of the issues in the amended petition.  Respondent's answer argues that the habeas petition should be denied because the grounds upon which it is based are procedurally defaulted or without merit.  On November 25, 2013, Respondent filed the state-court record, pursuant to Rule 5, RULES GOVERNING § 2254 CASES.  (ECF Nos. 27 - 37.)[3]

Upon review and applying the AEDPA standards, the Court finds that all habeas grounds are procedurally defaulted or meritless.  Accordingly, the Court will deny the petition.

## Procedural and Factual Background

The home that Petitioner invaded was the upstairs apartment at 1039 Bridge Street in Grand Rapids, Michigan.  The apartment was the residence of Karima Fleming, the woman that Petitioner sexually assaulted.  The crimes occurred in the early morning hours of December 30, 2008.  Petitioner's testimony regarding his activities that morning, the evening before, and the preceding months, differs irreconcilably from the testimony offered by Ms. Fleming.  The jury apparently found Ms. Fleming's account to be the credible one.

---

counsel did not investigate, present testimony, or argue that Petitioner was not injured, swollen, or bruised even though his victim testified that she kicked and pushed Petitioner away in her defense; or (2) that counsel permitted Petitioner to go through the jury selection in jail clothing.  He does not expressly include those issues in his habeas petition.

[3]The Rule 5 materials include several transcripts of the trial court proceedings.  The transcripts shall be referenced as follows:

| | |
|---|---|
| March 24, 2009 Preliminary Examination | (Prelim. Examination Tr., ECF No. 28, p.___) |
| December 7, 2009 Trial Transcript  (Volume 1) | (Trial Tr. I, ECF No. 30, p.___) |
| December 8, 2009 Trial Transcript  (Volume 2) | (Trial Tr. II, ECF No. 31, p.___) |
| December 9, 2009 Trial Transcript  (Volume 3) | (Trial Tr. III, ECF No. 32, p.___) |
| December 10, 2009 Trial Transcript  (Volume 4) | (Trial Tr. IV, ECF No. 33, p.___) |
| December 11, 2009 Trial Transcript  (Volume 5) | (Trial Tr. V, ECF No. 34, p.___) |
| January 21, 2010 Sentencing Transcript | (Sentencing Tr., ECF No. 35, p.___). |

I.    Ms. Fleming's testimony

Ms. Fleming testified that she, along with her four children, moved to Grand Rapids from Benton Harbor in March of 2008. (Trial Tr. II, ECF No. 31, pp. 36-37.) She moved in with her cousin, creating a household of two adults and eleven children. (*Id.*, p. 38.) Ms. Fleming eventually left that residence and moved into a hotel. (*Id.*, pp. 40-41.)

Ms. Fleming was introduced to Petitioner a few weeks after she arrived in Grand Rapids. (*Id.* pp. 38-39.) Petitioner invited Ms. Fleming and her children to move in with him. (*Id.*, p. 40). He resided in a three-bedroom home. (*Id.*) Ms. Fleming accepted Petitioner's invitation. (*Id.*)

Petitioner behaved in a controlling manner in his relationship with Ms. Fleming. (*Id.*, pp. 41-45 .) After a time he became verbally and physically abusive. (*Id.*, pp. 45-46.) In September of 2008, Ms. Fleming and her children moved out. (*Id.*, p. 46.) They went initially to a shelter, but after about a week, they moved into the upper apartment at 1039 Bridge Street. (*Id.*)

After a time, Petitioner moved some of his things into the apartment at 1039 Bridge Street. (*Id.*, p. 49.) Ms. Fleming had the only key to the apartment, but had a key made for Petitioner at his request. (*Id.*, p. 52.)

By the end of October, Petitioner's time at the apartment became increasingly sporadic. (*Id.*, p. 53.) He would be there briefly to change clothes in between work shifts at his two part-time jobs, but otherwise stayed out all day and night. (*Id.*) Ms. Fleming asked him to leave. (*Id.*) Petitioner took his things, returned his key to the apartment, and left. (*Id.*)

Even after Petitioner moved out, he and Ms. Fleming continued to talk. (*Id.*, pp. 54-56.) They discussed the prospect of renewing their relationship as well as a business opportunity they might pursue together. (*Id.*)

On Christmas day, as Ms. Fleming was preparing food for a family gathering, Petitioner arrived at the apartment uninvited. (*Id.*, pp. 60-62.) Petitioner asked for money for the joint business venture. (*Id.*) They talked for a while. (*Id.*) As Petitioner got ready to leave, two of Ms. Fleming's invited guests, including Kala Sanders, arrived. (*Id.*, pp. 62-63.) Petitioner was upset that Ms. Fleming had male guests. (*Id.*) He demanded Ms. Fleming dress more modestly and threatened to physically harm Ms. Fleming and her guests. (*Id.*)

Ms. Fleming left the apartment to pick up her cousin and her cousin's children. (*Id.*, p. 67.) When she returned, Petitioner was still there, but her other guests had left. (*Id.*, pp. 67-68.) Eventually Petitioner left as well. (*Id.*) Later that night, Petitioner returned. (*Id.*, pp. 69-70.) When Ms. Fleming did not answer Petitioner's knocks at the locked door, he kicked the door in, ranted for a while, and then left. (*Id.*, 69-71.)

On December 28, Ms. Fleming drove to Benton Harbor with Kala Sanders, for the purpose of dropping her children off with their grandmother. (*Id.*, pp. 72-73.) Petitioner called her while she was driving home. (*Id.*, p. 73.) Upon her return to Grand Rapids, she visited with Kala and his mother at Kala's mother's house. (*Id.*, p. 74.) Petitioner continued to call her, suggesting that he had purposely damaged her van. (*Id.*, p. 75.) Ms. Fleming did not answer his persistent telephone calls. (*Id.*)

Around 1:00 a.m. on December 30, Ms. Fleming returned to her apartment. (*Id.*, pp. 75-76.) She removed her clothing, put on pajamas, and began watching a movie on the living room couch. (*Id.*, p. 76.)

The next thing Ms. Fleming remembers is a blow to her face. (*Id.*, p. 77.) She awoke to a beating at the hands of Petitioner.[4] (*Id.*, p. 80.) He instructed Ms. Fleming to remove her clothes so they could have intercourse. (*Id.*, pp. 81-82.) She refused. (*Id.*, p. 82.) He removed her clothing and forced her to engage in penile/vaginal intercourse, first on her back and then again on her stomach. (*Id.*) Afterwards her phone rang, it was Kala Sanders. (*Id.*, pp. 82-83.) Petitioner became infuriated and began hitting Ms. Fleming again. (*Id.*) When Petitioner went in the bathroom to wash up, Ms. Fleming fled the apartment. (*Id.*, p. 84.)

Ms. Fleming went to her cousin's home. (*Id.*, pp. 85-86.) From there, she eventually called the police. (*Id.*) She received treatment for her injuries at the hospital and then went to the YWCA for a sexual assault examination. (*Id.*, pp. 88-94.)

Ms. Fleming was initially reluctant to press charges. (*Id.*, p. 95.) She cared about Petitioner and she was afraid he might do it again. (*Id.*) He continued to call her even after the assault. (*Id.*, pp. 96-99.) He again broke into her apartment. (*Id.*, pp. 99-101.) She then decided to press charges. (*Id.*, p. 101.)

II.    Petitioner's testimony

Petitioner's chronology of the events is generally consistent with Ms. Fleming's testimony: when they met, when they moved in to Petitioner's home, when Ms. Fleming and her

---

[4]During the incident, Ms. Fleming saw that her clock read 5:55 a.m. (*Id.*, p. 86.)

children moved in to 1039 Bridge Street,[5] when he and Ms. Fleming "broke up," when he visited on Christmas, and when she reported the sexual assault.  There were only a few key differences. Petitioner testified that he never beat Ms. Fleming, or hit her or threatened her.  (Trial Tr. IV, ECF no. 33, p. 41.)   Petitioner testified that Ms. Fleming was the "threatening" presence in the relationship.  (*Id.*)  Petitioner testified that Ms. Fleming threatened to falsely accuse him of a crime if he did not stop talking to other women.  (*Id.*, pp. 41-45, 55-57.)  Petitioner's characterization of his visit(s) to 1039 Bridge Street on Christmas day was also markedly different from Ms. Fleming's and more favorable to Petitioner.  (*Id.*, pp. 62-64.)

With respect to the night of December 29 and the following morning, Petitioner testified that he was initially with his girlfriend Leotie Makura at his home on Bates Street.  (*Id.*, p. 58.)  He stayed with her until she went to bed.  (*Id.*)  Then, Petitioner slipped out, drove to a park, met Ms. Fleming there, and had consensual sex in her minivan.  (*Id.*, pp. 58-60.)  Petitioner then returned to Leotie, who was still sleeping.  (*Id.*, p. 60.)  He then slept at the Bates Street home with Leotie until he awoke and showered and Leotie drove him to work.[6]  (*Id.*)  He arrived at work at 7:55 a.m.  (*Id.*)

Although that was Petitioner's trial testimony, it differed significantly from the account he had given to police.  In his first interview, Petitioner told Detective Forner he had not had sexual intercourse with Ms. Fleming since the beginning of December.  (*Id.*, pp. 65-66.)  In a

---

[5]Petitioner's story differs in that he testified they (Petitioner, Ms. Fleming, and her children) all moved into the 1039 Bridge Street apartment at the same time.  (Trial Tr. IV, ECF No. 33, p. 40.)

[6]Leotie Makura testified that she awoke at 5:15 a.m. on December 30.  (Trial Tr. IV, ECF No. 33, pp. 4-5.)  She went upstairs to use the shower they shared with the landlord.  Before she got to the room with the shower, she heard it running.  (*Id.*, pp. 5-6)  She "figured" it was Petitioner and went back downstairs.  (*Id.*, p. 6.)  She remained there until Petitioner woke her and told her it was time to go to work.  (*Id.*, pp. 6-8.)

subsequent interview on March 10, 2009, Petitioner told Detective Forner that he had sexual intercourse with Ms. Fleming when he visited her apartment on Christmas day.  (*Id.*, pp. 68-69.)

Before Petitioner testified, the prosecution had elicited testimony from Sarah Thibaut and Ann Hunt, forensic scientists with the Michigan State Police.  Ms. Hunt testified that it was overwhelmingly likely that the samples of sperm collected from the victim's body were from Petitioner.  (Trial Tr. III, ECF No. 32, p. 103-104.)  Ms. Thibaut testified that it was very unlikely that the sample tested was five days old when it was collected and very likely that it was much more recently deposited.  (*Id.*, pp. 88-91.)  Only after that testimony did Petitioner offer his account regarding consensual sexual activity with Ms. Fleming on December 29.

After a Monday jury selection followed by three days of testimony, arguments and instructions, the jury began deliberating first thing in the morning on Friday, December 11, 2009. They returned their verdicts of guilty on all counts before lunch.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

-8-

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 2015 WL 1400852, at

*3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

I.    Procedural default

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513 U.S. at 365-66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d

480, 483 (6th Cir. 1990). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

On his direct appeal, Petitioner failed to present the substance of his claim that counsel was ineffective for misstating facts, or his claim that Petitioner's trial was unfair and partial because his counsel failed to properly cross-examine prosecution witnesses, to the Michigan Supreme Court. Accordingly, he has failed to exhaust these issues. An applicant has not exhausted available state remedies if he has the right under state law to raise, by any available procedure, the question presented. 28 U.S.C. § 2254(c). If no further state remedy is available to the petitioner, exhaustion does not present a problem, but the claim is procedurally defaulted and the federal court must determine whether cause and prejudice exists to excuse the failure to properly present the claim in state court. *Id.*

Under Michigan law effective August 1, 1995, after a defendant's direct appeal is complete, he may file one motion for relief from judgment under Michigan Court Rule 6.500 *et. seq*. *See* MICH. CT. R. 6.502(G)(1). A defendant is not free to raise any ground for relief in such a motion. For example, he may not raise a ground for relief that was decided against him in a prior appeal unless there has been a retroactive change in the law, MICH. CT. R. 6.508(D)(2), nor may he raise an issue that could have been raised on appeal unless he demonstrates good cause for the failure to previously raise the issue and prejudice, MICH. CT. R. 6.508(D)(3).

It is beyond dispute that Petitioner raised these issues in his direct appeal and the issues were decided against him. *People v. Johnson*, No. 296722, 2011 WL 2557481 (Mich. Ct. App., Jun. 28, 2011). Moreover, it is beyond dispute that Petitioner failed to raise the issues to the

Michigan Supreme Court and he offers no cause to excuse the failure.  Under these circumstances, "[t]he [state] court may not grant relief . . . ."  MICH. CT. R. 6.508(D).

Because no avenue for relief remains in the state courts, Petitioner has procedurally defaulted his claims.  At this juncture, the Court must consider whether there is cause and prejudice to excuse Petitioner's failure to present the claims in state court.  *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  A petitioner who fails to demonstrate cause and prejudice cannot have a cognizable claim.  *Gray*, 518 U.S. at 162.  Further, where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner offers no "cause" for his failure to raise these two issues in his application for leave to appeal to the Michigan Supreme Court.  He was fully aware of the issues; he had previously raised them in the Michigan Court of Appeals.  Absent a demonstration of cause, prejudice need not be considered.  That part of Petitioner's habeas issue II that relates to counsel's misstatement of facts and habeas issue VI regarding counsel's failure to properly cross-examine witnesses, are procedurally defaulted and, thus, will not be considered by this Court.

II.    The alibi witness testified in jail clothing

Petitioner contends that he was denied due process, that his trial was neither fair nor impartial, because his alibi witness, Ms. Makura, testified in jail garb.  Before Ms. Makura testified, the trial judge explained her attire to the jury:

-12-

Ladies and Gentlemen, the next witness, the first witness that the defense is calling, is in custody at this point in time and will be here in jail greens.  Don't read into that or discount her testimony in any way, shape or form.  It is my understanding, as well as the attorneys' understanding, that she's incarcerated at this point in time on some misdemeanor traffic offense, and it's a policy of the Sheriff that when someone is incarcerated, other than--when they come in to testify in a case, they're not allowed to dress in this [sic] civvy clothes.

(Trial Tr. III, ECF No. 32, p. 207.)

The Michigan Court of Appeals flatly rejected Petitioner's due process challenge:

Defendant first argues that the trial court erred when it permitted a witness, Leotie-Jamillah Makura, to testify while wearing jail clothing.  This error, he maintains, infringed on the presumption of innocence and deprived him of a fair trial. This Court reviews a trial court's decision regarding witness attire for an abuse of discretion.  *People v. Banks*, 642 NW2d 351 (2002).  However, because defendant did not specifically challenge the trial court's ruling on the ground that it infringed the presumption of innocence, we review the unpreserved claim for plain error affecting defendant's substantial rights.  *People v. Carines*, 597 NW2d 130 (1999).

This Court has held that "handcuffing or shackling of a defense witness" does not "adversely and unfairly affect[ ] a criminal defendant's presumption of innocence, thereby undermining the fairness and impartiality of the trial."  *Banks*, [642 N.W.2d at 358].  This is because the appearance of the witness does not suggest that the defendant is predisposed to commit crimes, is dangerous, or cannot be trusted.  *Id.*  Consequently, defendant's claim that the trial court's decision infringed on his right to be presumed innocent is meritless.

In addition, we disagree that Makura's attire prejudiced defendant's trial. Unlike the facts in *Banks*, [642 N.W.2d at 358-359], defendant's entire defense was not premised entirely on Makura's testimony.  Rather, Makura simply offered testimony that suggested that defendant might have been home at the time of the home invasion and rape at issue.  Importantly, even if the jury believed Makura, it could nevertheless have concluded that defendant committed the offenses.  Makura did not directly identify defendant as the person in the shower, may have been mistaken about the time, and defendant's theory of the case was that he did in fact meet the victim and have sex with her, but that it was consensual.  In addition, the trial court took precautions to minimize the effect of the jury seeing the witness in jail clothes; it told the jury that Makura was arrested for "some misdemeanor traffic offense" and instructed it not to consider her attire. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors."  *People v.*

*Abraham*, 662 NW2d 836 (2003). Accordingly, any prejudice to defendant was not outcome determinative. *Banks*, [642 N.W.2d at 358].

*People v. Johnson*, No. 296722, 2011 WL 2557481 *1 (Mich. Ct. App., Jun. 28, 2011) (parallel citations omitted).

   To prevail on this issue, Petitioner must show that the Michigan court's resolution of his challenge was contrary to, or involved an unreasonable application of, clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  He has failed to meet his burden.

   This Court has previously noted that there is no clearly established federal law that supports the proposition that permitting an alibi witness to testify in jail clothing violates a federal constitutional right.  *Taylor v. Jones*, No. 1:04-cv-28, 2006 WL 3231260 *1 (W.D. Mich. Nov. 7, 2006) ("[T]he Magistrate Judge correctly concluded that no federal law supports petitioner's claim that permitting this rebuttal witness to testify in jail clothing violated his federal constitutional rights as recognized by the United States Supreme Court.") The Magistrate Judge's analysis is compelling:

> Petitioner's claim is without merit.  "The inference to be drawn from prison clothing is that the witnesses were in prison, a fact that is not inadmissible."  *United States v. Adams*, 1 F.3d 1566, 1584 (11th Cir.1993).  While a criminal defendant's appearance at trial in prison clothes may implicate his due process right to the presumption of innocence, the tactical decision to present witnesses in prison clothing does not prejudice the defense. *Johnson v. Spalding*, 510 F.Supp. 164, 171 (E.D.Wash.1981).  "The potential harm of shackles-that they make the jury think the witnesses are dangerous or violent-is not present when a witness merely wears prison clothing." *Woods v. Thieret*, 5 F.3d 244, 250 (7th Cir.1993). *Cf. Cook v. Beto*, 425 F.2d 1066, 1067 (5th Cir.1970) (the appearance of a co-defendant in jail clothing, to allow witnesses to identify him as one of the men who committed the robbery with the defendant, did not constitute grounds for federal habeas relief).  Accordingly, there is no basis for federal habeas relief on this claim.

-14-

*Taylor*, 2006 WL 3231260 at *21.  Moreover, the court of appeals' conclusion that any element of unfairness that may have followed from Ms. Makura's attire was promptly remedied by the trial court's corrective instruction is patently reasonable.  The court of appeals' conclusion regarding the quality of Ms. Makura's alibi testimony is also amply supported by the record.  In short, Petitioner has failed to establish any entitlement to habeas relief based on the fact that his alibi witness wore jail clothing while she testified.

III.    The 1039 Bridge Street lease

Petitioner's habeas issues III, IV, and V have their foundation in a single document: the 1039 Bridge Street lease.  As explained fully below, the lease was not part of the trial record. Petitioner attached to his appellate briefs, however, a document that he claimed was the lease. (Appeal Br., Ex. A, ECF No. 37.)[7]  According to Petitioner, he was a party to the lease at 1039 Bridge Street as evidenced by that document.  The document includes Petitioner's name in two places: hand printed, but squeezed in, on the line that designates the Lessee; and hand written, but squeezed in, on the line for the Lessee's signature.

Petitioner's focus on the document would appear to be warranted.  Certainly a document that establishes Petitioner's legal right to be on premises would seem to be relevant and material to a claim that he unlawfully invaded those premises. The strategic benefit of the lease to Petitioner's defense, however, is not so clear cut.[8]

---

[7]Petitioner also includes a copy of the five-page lease as part of his amended petition. (Residential Lease, ECF No. 25-3, PageID.414-418.)

[8]It is not clear from the record whether Petitioner's rights under any lease would have survived being "kicked out" in early December, 2008.  Moreover, even if Petitioner retained some rights under the lease it is possible that his entry into the home that night may have still been "without permission" as the home invasion statute requires.  Neither party has provided authorities on the issue of whether a lessee can unlawfully invade a home he is leasing.  Ultimately, however, a jury would not likely be sympathetic to an alternative defense that Petitioner had permission to enter the home

At the Petitioner's preliminary examination, Ms. Fleming testified that no one else was on the lease or authorized to enter the apartment on 1039 Bridge Street and that Petitioner did not have permission to enter the apartment on December 30.  (Prelim. Examination Tr., ECF No. 28, pp. 5, 18.)  On the second day of trial, after the jury was selected, but before opening argument and testimony, the lease became an issue because Petitioner's counsel had asked the trial judge to sign a subpoena to compel production of the lease by the federal probation department.  (Trial Tr. II, ECF No. 31, pp. 8-10.)  In the context of discussing that issue, Petitioner's counsel learned that the prosecution did not dispute the existence of the lease identifying Petitioner as a lessee, but that the prosecutor contended the document did not reflect reality; rather, Ms. Fleming would testify, that lease document was created after-the-fact, as a ruse to satisfy Petitioner's probation officer with regard to Petitioner's residence.  (*Id.*, pp. 10-11.)

Under those circumstances, the trial court ruled, if Petitioner wished to delve into the lease, the prosecution would be permitted to explore the fact that Petitioner was on federal supervised release.  (*Id.*)  The trial court had previously ruled that the fact that Petitioner was on supervised release was <u>not</u> to be presented to the jury.  (*Id.*, pp. 8-9.)  Thus, counsel was left to weigh the uncertain benefit of presenting the jury with a dispute as to whether Petitioner was on the lease against the certainty that the jury would learn Petitioner was on federal supervised release for other crimes.  Counsel's strategy was clearly to avoid exposing the jury to Petitioner's federal criminal history.

---

where Ms. Fleming was raped, particularly when his primary defense was that he was never there.  Petitioner's counsel made an attempt at the alternative argument.  He argued that because there was no evidence of forced entry, Petitioner either was there with permission or he was not there at all.  (Trial Tr. IV, ECF No. 33, p. 125.)  The fact that alternative theories are legally permissible does not mean they are practically or strategically sound.

Despite the trial court's decision regarding the lease and Petitioner's counsel's expressed desire to avoid the lease issue for the purpose of avoiding the probation issue, the lease came up anyway.  During Ms. Fleming's testimony, in recounting statements made by Petitioner on December 25, 2008, she stated:

> I said, "no, you don't live here." [Petitioner said] "Well, my name is on the lease." I said, "You don't pay bills here, your name is not on the lease, it's just on my copy . . ."

(Id., p. 66.)  A bench conference was held and the parties moved on.  No further testimony regarding the lease was offered.

Petitioner now supplies the contested lease and–presuming it authenticates itself, conclusively explains the lessor/lessee relationship, and establishes his right to enter the property–contends that Ms. Fleming perjured herself (habeas issue III), the prosecutor effectively suborned perjury (habeas issue IV), and his trial was unfair because counsel failed to introduce the lease into evidence (habeas issue V).  Petitioner overstates the power of this document.

A.    Perjured testimony

The Michigan Court of Appeals rejected Petitioner's arguments regarding perjured testimony: "The record contains clear evidence that defendant was not actually a party to the lease, but was added to the victim's copy in order to make it appear that defendant had met a condition of his federal probation.  Thus, the victim's testimony about the lease was not inaccurate . . . ." *Johnson*, 2011 WL 2557481 at *4.  The court of appeals' factual determinations regarding Ms. Fleming's testimony were not unreasonable; they find ample support in the record.  Accordingly, Petitioner's constitutional challenges that are premised on perjured testimony (habeas issues III and IV) have no merit.

-17-

B.       Petitioner's counsel's failure to introduce the lease

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

The Michigan Court of Appeals resolved the issue as follows:

> To establish ineffective assistance of counsel, defendant must show that his trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and, but for his counsel's errors, there is a reasonable probability that the results of his trial would have been different.  *People v. Toma*, 613 NW2d 694 (2000).

\*       \*       \*

-18-

> Defendant . . . claims that defense counsel was ineffective for not adequately impeaching the victim's testimony with regard to the apartment lease and for not introducing the lease into evidence as mitigating evidence.  First, the record reflects only that defendant's name was written in on the victim's copy of the lease so defendant could provide a lease with his name on it to his federal probation officer.  Thus, the record does not support that defendant was a party to the lease with the landlord.  Second, introducing the lease on which defendant's name appeared into evidence would have undoubtedly resulted in the jury learning that defendant was on federal probation, which defense counsel clearly wanted to avoid.  Accordingly, it was a matter of sound trial strategy to avoid introduction of the lease into evidence.  *[People v.] Garza*, [631 N.W.2d 764 (Mich. Ct. App. 2001)].  Accordingly, this decision did not amount to ineffective assistance.  *[People v.] Toma*, [613 N.W.2d 694 (Mich. 2000)].

*Johnson*, 2011 WL 2557481 at *3 (parallel citations omitted).  Although the court of appeals relied upon state court authority, *Toma* expressly cites the *Strickland* standard.  *Toma*, 613 N.W.2d at 703-704.  Thus it cannot be said that the state court's decision is contrary to clearly established federal law as set forth in *Strickland*.

Moreover, the state court applied the test appropriately.  Counsel was faced with a difficult choice.  He opted to avoid informing the jury about Petitioner's federal criminal history.  That was clearly a strategic decision.  Disagreement by a defendant with tactics and/or strategy will not support a claim of ineffective assistance.  *Strickland*, 466 U.S. at 689.

Critically, counsel's strategy paid off.  The fact that Petitioner's name was on at least one copy of the lease came into evidence through the victim without the jury ever learning about Petitioner's federal criminal history or the ruse that Ms. Fleming claimed they perpetrated on the federal probation department.  Thus, even if it were error to not introduce the lease, Petitioner has failed to demonstrate that the error had any effect on the verdicts.  Petitioner's ineffective assistance claim related to the lease has no merit.

-19-

IV.     Other ineffective assistance of counsel claims

Plaintiff contends his counsel rendered ineffective assistance in other ways.  He argues that his counsel was unprepared and that his lack of preparedness impacted Petitioner's ability to present his alibi defense, other exculpatory witnesses, and exculpatory evidence in the form of text messages from the victim to the Petitioner.  Each argument is addressed below.

A.     Failure to timely file a notice of alibi

Michigan imposes a statutory obligation on a felony defendant to file and serve a notice of intention to claim an alibi defense at least ten days before trial.  MICH. COMP. LAWS § 768.20.  In this instance, counsel did not timely file and serve the notice.  Nonetheless, the trial court denied the prosecutor's request to exclude the testimony of the alibi witness, Leotie Makura, because she had testified as an alibi witness at the preliminary examination months before the trial. Under those circumstances, the Michigan Court of Appeals acknowledged that failing to timely file the notice might be objectively unreasonable, but because the trial court permitted the testimony anyway, Petitioner had failed to demonstrate any prejudice. *Johnson*, 2011 WL 2557481 at *2.  That resolution is neither contrary to, nor an unreasonable application of, the *Strickland* standard, and the factual determinations upon which it is based are well-supported by the record. Petitioner has failed to establish that he is entitled to habeas relief because of the late-filed notice of alibi.

B.     Failure to timely disclose witnesses

On Friday, December 4, 2008, Petitioner's counsel gave the prosecutor a list of nine possible defense witnesses.  (Trial Tr. I, ECF No. 30, pp. 14-16.)  The trial court excluded any of Petitioner's witnesses that were not otherwise listed on the information.  (*Id.*)  The record provided to this Court does not include the list of witnesses that counsel faxed to the prosecutor three days

before trial nor does it include the information.  Accordingly, it is impossible to ascertain the identities of the witnesses who were excluded by the trial court's order.  Petitioner's counsel mentioned only one subject of testimony he was hoping to elicit from the witnesses: "the alleged victim's continuing a pattern of harrassment the defendant . . . ." (*Id*., p. 15.)  Even though Petitioner has not identified any of these witnesses, he suggests their exclusion decimated his defense.

The Michigan Court of Appeals was not swayed by Petitioner's argument:

> Defendant also asserts that defense counsel was ineffective for failing to provide a witness list to the prosecutor in a timely manner, which resulted in the witness list being excluded pursuant to MCR 6.201(A)(1).  Defendant completely fails to argue or support that any specific witness, much less a relevant and necessary witness, was precluded from testifying.  As such, defendant failed to establish the factual predicate for his claim of error.  *See People v. Hoag*, 594 NW2d 57, 59 (1999).  In any event, it is clear that defendant was able to fairly present his theory of the case at trial—namely, that the victim fabricated the allegations because she was angry at defendant—through other witnesses and there is no evidence that additional witnesses would have lent decisive weight to this theory.  Therefore, on this record, even if defendant could show that defense counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, defendant cannot establish prejudice.  *Toma*, 613 N.W.2d at 703-704.

*Johnson*, 2011 WL 2557481 at *2 (parallel citations omitted).  Although Petitioner's appellate brief mentions that witnesses were excluded, it does not identify any of the excluded witnesses or what their testimony might have been.[9]   Therefore, the court of appeals' resolution of this issue is well-

---

[9]In his application for leave to appeal to the Michigan Supreme Court, Petitioner identifies two allegedly excluded witnesses: Miguel and Dora Estrada.  (Appellant's Br., ECF No. 25-5, PageID.441.)  The Estradas were the landlords on the lease for the upper apartment at 1039 Bridge Street.  Petitioner claims the Estradas would have testified he was a legitimate lessee of the property and his name was not simply placed on the lease as a ruse.  There is no evidence in the record to support Petitioner's statement regarding what the Estradas would have said on the stand.  More importantly, although such testimony would have bolstered Petitioner's claim with regard to the lease, it would not have precluded the "ruse" argument; thus, proofs regarding the lease would have had the undesirable effect of informing the jury about Petitioner's federal criminal history.  Given the testimony that was introduced regarding the fact that Petitioner's name was on the lease, there is simply no record support for Petitioner's argument that more firmly establishing his rights as a lessee would have likely had an effect on the verdicts.  *See* Discussion § III, above.

supported by the record.  Petitioner has failed to establish prejudice resulting from counsel's failure

to timely file the witness list; accordingly, he is not entitled to habeas relief.

C.    <u>The text messages</u>

After December 30, but before Ms. Fleming decided to press charges near the end of

February, she and Petitioner exchanged a series of text messages.  The messages were stored on

Petitioner's cellphone.  Counsel knew they were on the cellphone and, more than two months before

the trial, had informed the prosecutor of his intent to introduce them as evidence at trial.  (Trial Tr. I,

ECF No. 30, p. 3.)  But, counsel failed to do so because he was unable to retrieve them until Leotie

Makura assisted him in that effort the day before trial began.  (*Id*., pp. 5-7.)  The court stated the text

messages would be suppressed and that no reference should be made to them unless the court had

cleared it beforehand.  (*Id*., pp. 7-9.)   Counsel sought clarification (*Id*., pp. 16-19.)  The court

ultimately permitted testimony regarding the fact that Ms. Fleming and Petitioner continued to

communicate after the crimes, and even the general topic of those conversations, but the court did

not permit Petitioner to introduce the word-for-word content of the text messages.  (*Id*., p. 19; Trial

Tr. II, ECF No. 31, pp. 95-102, 136-137, 143-146; Trial Tr. IV, ECF No. 33, pp. 78-79.)  Counsel

made an offer of proof with regard to the content of the messages (Trial Tr. IV, ECF No. 33, pp. 146,

147), and a transcription was attached as an exhibit to Petitioner's appellate briefs (ECF No. 25-2,

PageID.392).

Petitioner argues that the text messages were exculpatory and that counsel's failure

to timely disclose them during discovery constituted ineffective assistance.  The Michigan Court of

Appeals disagreed:

-22-

Defendant argues that the victim could not be effectively cross-examined after certain text messages were excluded from evidence because of defense counsel's discovery violation. Defense counsel sought to use the text messages for several reasons relevant to the offered defense. However, testimony relating to those particular reasons was clearly set forth separate and apart from the text messages during the trial. Accordingly, even if defendant could show that defense counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, defendant cannot establish prejudice. *Toma*, 613 N.W.2d at 703-704.

*Johnson*, 2011 WL 2557481 at *2 (parallel citation omitted).[10]

Once again, the state court employed the correct standard. The factual determination that Petitioner was able to present evidence regarding the post-assault communications between Ms. Fleming and Petitioner finds support in the record. (Trial Tr. II, ECF No. 31, pp. 95-102, 136-137, 143-146; Trial Tr. IV, ECF No. 33, pp. 78-79.) Indeed, Petitioner's counsel elicited sworn testimony from Ms. Fleming that even after the December 30 assault, she regularly talked to Petitioner, she still loved him, and she discussed getting back together with him. (*Id.*) The text messages add nothing to the obvious incongruity of her stated feelings for Petitioner with her status as a victim of his brutal physical assault.[11] Because Petitioner has failed to demonstrate prejudice, Petitioner has failed to establish that he is entitled to habeas relief.

---

[10]The "several reasons" referenced by the court of appeals included the argument that "that the victim fabricated the allegations because she was angry at defendant[,]" *Johnson*, 2011 WL 2557481 at *2, as well as the argument that Ms. Fleming's post-assault behavior in the form of continued contact with Petitioner, was inconsistent with being a rape victim, (Trial Tr. IV, ECF No. 33, p. 140).

[11]The prosecution offered the testimony of social worker Erica Schnittdiel as an expert in the area of domestic assault, specifically sexual assault in the context of domestic relationships, to help explain that incongruity. (Trial Tr. II, ECF No. 31, pp. 165-188.)

**Conclusion**

In light of the foregoing, the Court will deny Petitioner's application because certain of Petitioner's claims are procedurally defaulted and the remainder of his petition fails to present a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   January 11, 2017            /s/ Paul L. Maloney
                                     Paul L. Maloney
                                     United States District Judge